UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DEBBIE DEA BASHAM,

       Plaintiff,

v.                          Civil Action No. 2:15-15432

SELECT SPECIALTY HOSPITAL,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Pending is defendant's Motion for Summary Judgment (ECF No. 43), filed on October 19, 2016.

## I.   Facts and Procedural History

Plaintiff Debbie Dea Basham worked for defendant Select Specialty Hospital ("Select Specialty" or "the hospital") as a respiratory therapist, an at-will employee, for almost fourteen years before her termination on May 22, 2015. Select Specialty is an acute care medical facility inside St. Francis Hospital in Charleston, West Virginia. Basham was a superior employee who received excellent performance reviews. See Pl.'s Resp. to Def.'s Mot. for Summ. J. (hereinafter "Resp.") Ex. 2.

During the course of her employment, Basham requested and received leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., on several occasions. Most

recently, Basham requested and received intermittent FMLA leave
beginning in 2010 to care for her chronically ill mother.

"The FMLA's central provision guarantees eligible
employees 12 weeks of leave in a 1-year period following certain
events: a disabling health problem; a family member's serious
illness; or the arrival of a new son or daughter." Ragsdale v.
Wolverine World Wide, Inc., 535 U.S. 81, 86; 29 U.S.C. §
2612(a)(1). Furthermore, leave "must be granted, when 'medically
necessary,' on an intermittent or part-time basis." Ragsdale, 535
U.S. at 86; 29 U.S.C. § 2612(b)(1). Employers may require
employees to certify their FMLA leave, which involves having a
physician attest to the necessity of the leave. As a particular
instance of protected leave goes on, the employer may require the
employee periodically to "recertify" that leave as well. See,
e.g., 29 C.F.R. 825.308(c). Select Specialty terminated Basham in
May 2015 after she allegedly failed to recertify her FMLA leave on
time.

As an employee of Select Specialty, Basham was subject
to the hospital's attendance policy. That policy provided that
employees must notify a supervising officer of the reason and
expected length of an absence in advance. Additionally, Select
Specialty's policy required that, when calling in, an employee
state that a leave request was FMLA-related in order for that

2

absence not to accrue "points" in the employee's attendance record. Employees received three points for each unprotected absence, and disciplinary actions could occur under the policy after a certain number of points accrued. The policy further provided as follows:

> All counseling levels . . . should be given prior to termination with the exception of non-point based attendance infractions or those actions rising to the level of immediate termination. . . . Attendance infractions will follow a separate progressive disciplinary track from non-attendance based infractions.

> Employees receiving disciplinary action under this policy are expected to improve their attendance. Failure to improve and/or sustain improvement may result in the employee receiving additional disciplinary action up to and including termination.

Resp. Ex. 6 § 5 (hereinafter "Policy"). The policy also contains a catchall disclaimer at its conclusion stating that "[Select Specialty] retains the authority to review infraction of the Attendance Policy on a case by case basis for possible exception upon the review and approval of the Executive Vice President of Human Resources." Policy at p. 6. The "counseling" levels are (1) an "Attendance Policy Review" after six points, (2) a "Documented First Warning" after twelve points, (3) a "Documented Written Warning" after sixteen points, and (4) termination after twenty points. Id. § 5.

Basham sought, and Select Specialty approved, intermittent FMLA leave beginning in 2010 to care for her mother, generally requiring her to miss between zero and four days of work per month. Following this certification, Select Specialty required Basham to recertify her leave at subsequent but somewhat irregular intervals over the following five years. Basham did not first recertify her leave until February 28, 2012, and recertified again four more times on December 11, 2012 (roughly nine months later), July 1, 2013 (roughly seven months later), April 16, 2014 (roughly nine months later), and November 25, 2014 (roughly seven months later). Resp. Ex. 3. On each occasion, she timely recertified her leave and Select Specialty protected her absences under the FMLA. Charles Stephens, Select Specialty's Human Resources Coordinator at the time of Basham's termination, explained in his discharge memorandum that "[b]ecause of the irregularity of [Basham's] work attendance, [the hospital] had to schedule another [respiratory therapist] to insure [sic] consistent patient care. This was an additional cost to the company." Resp. Ex. 5 at 2 (hereinafter "Stephens Discharge Mem.").

On January 16, 2015, Stephens, then the new HR Coordinator, sent Basham a letter reminding her of the importance of stating that her leave is FMLA-related when calling in to report an absence. Resp. Ex. 10. Basham disputes that she ever

4

received this letter. Resp. Ex. 8 at 73-74 (hereinafter "Basham Dep."). Then, on February 24, 2015, Basham apparently received "counseling" under the hospital's attendance policy, in a letter designated a "Final Warning" (which appears to be the same as the "Documented Written Warning," the counseling given after accumulating sixteen or more points) stating that Basham had accumulated twenty-nine points in total. Resp. Ex. 7. Basham testified that she had not received either of the first two counseling levels prior to receiving the final "Documented Written Warning" on February 24, 2015, and Select Specialty's records appear to confirm that she had not received any prior counseling. Compare Basham Dep. at 86 with Resp. Ex. 9.

On April 16, 2015, Select Specialty requested by letter a sixth recertification from Basham by May 8, 2015, extended to May 18, 2015. The hospital asked for this recertification to be made in less than six months after the last recertification, being an interval shorter than the interval for prior recertifications by Basham. Resp. Ex. 3. Select Specialty states that it issued the recertification sooner than usual because Basham's usage of intermittent leave had increased. On Basham's prior recertification form, her mother's treating physician indicated that her mother would need intermittent care approximately one day per week for two to four hours, and also that her mother's condition would cause flare-ups and related incapacity for eight

hours at a time for one to two days per month. Def.'s Reply to Resp. (hereinafter "Reply") Ex. 27. Brittany Shakespeare, Select Specialty's Leave Specialist who evaluated Basham's FMLA leave, for some reason chose to interpret the treating physician's statements on the form to mean that Basham's leave "would be only one to two days per month." Reply Ex. 28 at 2. Shakespeare noted that, in fact, Basham required three days of leave in January 2015, four days in March 2015, and four days in just the first ten days of April 2015, being less than two weeks in the first one-fourth or so of the year. Id.

Select Specialty requested that Basham submit her recertification paperwork, part of which had to be completed by the treating physician, by May 8, 2015, twenty-two days after issuing its request. Basham provided the paperwork to her mother's physician, who completed it on April 26, 2015. Basham, however, did not return the paperwork immediately, testifying that her mother was so seriously ill that she "actually kind of forgot that [the paperwork] was there." Basham Dep. 121. Basham told Select Specialty that she could not get the paperwork to Select Specialty in time, and they agreed to extend the deadline by ten days to May 18, 2015. Id. at 108.

The parties agree that at 8 p.m. on Saturday, May 16, 2015, two days before the deadline, Basham attempted to return the

recertification paperwork to Select Specialty by faxing it from the nursing station at Select Specialty's Charleston facility to the corporate office. Reply 4. After faxing prior recertification paperwork, Basham had received a fax confirmation page and, on the lower half of her confirmation page, a replica of the first page of the faxed document. <u>See</u> Def.'s Mot. for Summ. J. (hereinafter "Def.'s Mot.") Ex. 15. On the May 16 fax confirmation sheet, however, she received a one-page confirmation sheet showing that she had faxed a document with four pages but without a replica of the first page of the fax. Resp. Ex. 14. The confirmation page was blank on the bottom half of the page except for several grainy lines. Resp. Ex. 14.

In the corporate office, Shakespeare received a one-page transmission record accompanied by four pages that were "essentially blank," Resp. at 6, appearing only to give a hint of grainy lines and perhaps some text without identifying the sender, <u>see</u> Def.'s Mot. Ex. 17. Basham did not attempt to follow up on the fax before the May 18 deadline, and Select Specialty did not inquire regarding her missing recertification form. Shakespeare testified that it is not Select Specialty's policy to contact employees "directly," except by written communications. Reply 5. Basham called Select Specialty twice and left a voice message with Shakespeare on May 21st, and Shakespeare testified that she returned the call, but the two never spoke. Resp. Ex. 4 at 121

(hereinafter "Shakespeare Dep."). Consequently, Select Specialty claims it did not receive a completed recertification form by the May 18 deadline. However, Barbara Foster, Select Specialty's Regional Human Resources Director, testified that there was not much question that Basham made a "reasonable attempt" to recertify on time. Reply Ex. 33 at 68 ("Q: -- but you would agree with me that there is not really much of a question that Debbie Basham made a reasonable attempt to try to get the paperwork in on time? A: Correct --") (hereinafter "Foster Dep.").

Without a completed form, Shakespeare and Stephens treated Basham's absences as unprotected after the April 16th letter requesting a sixth recertification from her, and Select Specialty assessed Basham with a total of 49 attendance points as of May 19, 2015. Shakespeare sent an email to Stephens at 11 a.m. on May 18th notifying him that Basham had not returned the paperwork; she did not contact Basham regarding the paperwork. Shakespeare Dep. at 95, 98. Consequently, the hospital's CEO, Frank Weber, decided to terminate Basham, and on May 22, 2015, Basham was called in to meet a final time with Stephens and the Chief Nursing Officer, Francis Stump, for her discharge meeting. During the discharge meeting, Basham alerted Stephens and Stump that she had faxed the forms prior to the deadline. Stephens Discharge Mem. at 2. Nevertheless, Select Specialty terminated Basham that day. Stephens testified when asked why he did not

revisit her termination after speaking with Basham at her discharge meeting that "number one, policies and procedures; that's what I follow." Resp. Ex. 1 at 144 (hereinafter "Stephens Dep."). Although Stephens did not make the termination decision, he also testified that he might have been able to "suggest we follow up and hold off [on the termination] at that point." Stephens Dep. 146. Weber, however, later attested that neither Stephens nor Stump had the authority to reverse his termination decision. Def.'s Mot. Ex. 21. Stephens also testified that if Basham had turned in the paperwork on time, she would not have been terminated. Stephens Dep. 82 ("Q. So to simplify the issue, if Debbie turns in this, the paperwork on time, she's not terminated? A. Correct.").

On September 4, 2015, Basham filed this case in the Circuit Court of Kanawha County, West Virginia, alleging a single count containing each an interference claim and a retaliation claim under the FMLA. Compl. ¶¶ 19-26. The Complaint specifically alleges as follows:

> 23. . . . Defendant attempted to interfere with Plaintiff's ability to use FMLA leave by "counseling" Plaintiff on her absences (despite knowing that the absences were protected by the FMLA) and then falsely claiming that Plaintiff's leave would not be protected unless she expressly mentioned the "FMLA."
>
> 24. Defendant then retaliated against Plaintiff for invoking her rights under the FMLA by terminating her

employment as describe [sic] in the preceding paragraphs.

Id. ¶¶ 23-24. Defendant removed to this court on November 20, 2015, and filed its motion for summary judgment on October 19, 2016.

In its motion, Select Specialty argues that both Basham's interference claim and her retaliation claim must fail. First, Select Specialty asserts that its recertification procedures are permissible under the FMLA and that Basham did not properly assert a harm arising from the counseling and call-in requirements imposed by Select Specialty. Second, Select Specialty contends that, even if Basham can make out a case of prima facie retaliation, she cannot show that Select Specialty's assertion that it fired her because of her unprotected absences was pretext for retaliation.

Basham responds first that the hospital interfered with her rights by terminating her. Select Specialty, she claims, interfered with her right to take FMLA leave after she made diligent, good faith efforts to recertify and then to notify the hospital that she had made that attempt. Basham further contends that her termination was unlawful because the recertification request violated the FMLA's rules for when employers can issue such requests. Second, with respect to retaliation, Basham asserts that Select Specialty's stated reason for termination was

pretextual because of the unusual timing of the recertification request, because Select Specialty ignored its own policy in terminating her, and because its explanation is generally not credible given Basham's history at Select Specialty.

In its reply, the hospital contends that Basham has abandoned the interference claim set forth in her complaint, to wit, that it interfered with her FMLA rights in two ways: by counseling her and by requiring her to state that her leave was FMLA-related when calling in. Instead, Select Specialty argues that Basham, in her response to its motion, has improperly asserted at the summary judgment stage a new claim that the hospital interfered with her FMLA rights by terminating her.

The court will address Basham's interference claim and her retaliation claim in turn.

## II. Discussion

### a. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary

to establish the elements of a party's cause of action.  __Anderson__

__v. Liberty Lobby, Inc.__, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing

the record and all reasonable inferences drawn therefrom in a

light most favorable to the non-moving party, a reasonable fact-

finder could return a verdict for the non-movant.  __Id.__  The moving

party has the burden of showing - "that is, pointing out to the

district court - that there is an absence of evidence to support

the nonmoving party's case."  __Celotex Corp. v. Catrett__, 477 U.S.

317, 325 (1986).  If the movant satisfies this burden, then the

non-movant must set forth specific facts as would be admissible in

evidence that demonstrate the existence of a genuine issue of fact

for trial.  Fed. R. Civ. P. 56(c); __id.__ at 322-23.

A party is entitled to summary judgment if the record as

a whole could not lead a rational trier of fact to find in favor

of the non-movant.  __Williams v. Griffin__, 952 F.2d 820, 823 (4th

Cir. 1991).  Conversely, summary judgment is inappropriate if the

evidence is sufficient for a reasonable fact-finder to return a

verdict in favor of the non-moving party.  __Anderson__, 477 U.S. at

248.  A court must neither resolve disputed facts nor weigh the

evidence, __Russell v. Microdyne Corp.__, 65 F.3d 1229, 1239 (4th Cir.

1995), nor make determinations of credibility, __Sosebee v. Murphy__,

797 F.2d 179, 182 (4th Cir. 1986).  Inferences that are "drawn

from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." **United States v. Diebold, Inc.**, 369 U.S. 654, 655 (1962).

### b.     FMLA Legal Standard

Basham makes two claims regarding her treatment as a Select Specialty employee under the Family Medical Leave Act – an interference claim and a retaliation claim. **See Yashenko v. Harrah's NC Casino Co., LLC**, 446 F.3d 541, 546 (4th Cir. 2006) (referring to interference and retaliation claims as claims of violations of "prescriptive" and "proscriptive" rights, respectively).  "[T]he difference is that [a retaliation] claim requires proof of discriminatory or retaliatory intent while [an interference claim] requires only proof that the employer denied the employee his or her entitlements under the Act." **Kauffman v. Fed. Exp. Corp.**, 426 F.3d 880, 884 (7th Cir. 2005).

### c.     The Interference Claim

An FMLA interference claim arises under 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

> The FMLA's central provision guarantees eligible
> employees 12 weeks of leave in a 1-year period
> following certain events: a disabling health problem;
> a family member's serious illness; or the arrival of a
> new son or daughter. 29 U.S.C. § 2612(a)(1). During
> the mandatory 12 weeks, the employer must maintain the
> employee's group health coverage. § 2614(c)(1). Leave
> must be granted, when "medically necessary," on an
> intermittent or part-time basis. § 2612(b)(1). Upon
> the employee's timely return, the employer must
> reinstate the employee to his or her former position
> or an equivalent. § 2614(a)(1). The Act makes it
> unlawful for an employer to "interfere with, restrain,
> or deny the exercise of" these rights, § 2615(a)(1),
> and violators are subject to consequential damages and
> appropriate equitable relief, § 2617(a)(1).

Ragsdale, 535 U.S. at 86-87. Basham alleges that defendant here

interfered with her entitlement to leave to care for her mother

under the FMLA.

"To make out an 'interference' claim under the FMLA, an

employee must thus demonstrate that (1) he is entitled to an FMLA

benefit; (2) his employer interfered with the provision of that

benefit; and (3) that interference caused harm." Adams v. Anne

Arundel Cty. Pub. Sch., 789 F.3d 422, 427 (4th Cir. 2015) (citing

Ragsdale, 535 U.S. at 89). A denial of FMLA leave to which an

employee is entitled is a violation of the statute. Id.

Employees likewise "have a right 'to be restored by the employer

to the position of employment held by the employee when the leave

commenced.'" Yashenko, 446 F.3d at 546 (quoting 29 U.S.C.

2614(a)(1)). As the Tenth Circuit has said, "[i]f an employer

interferes with the FMLA-created right to medical leave or to

reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent." Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960-61 (10th Cir. 2002) (noting that "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave — but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave").

The Supreme Court has further elaborated on the concern ensconced in the third prong of the Adams interference framework, the harm inflicted on the employee. In particular, an FMLA interference claim can provide "no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). The remedy is tailored to the harm suffered." Ragsdale, 535 U.S. at 89.

Select Specialty contends that Basham has not made out a claim for interference because she cannot show actual harm to her as a result of the counseling she received or the call-in procedure requiring her to mention FMLA. Basham appears to respond that Select Specialty interfered with her FMLA

15

entitlements by terminating her.  Select Specialty is correct, however, that Basham cannot amend her pleadings at this stage to allege a new interference violation different from that alleged in her complaint.

A complaint is essential to the course of a legal action and orients the parties and their contentions through the adversary process.

> Because a complaint "guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations," constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant.

Harris v. Reston Hosp. Ctr., LLC, 523 F. App'x 938, 946 (4th Cir. 2013).  Asserting a "new theory" or "new argument" at the summary judgment stage prejudices the defendant because it requires "different discoverable inquiries." Id. at 947.  See also Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) ("Additionally, despite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun.").

Plaintiff's interference theory in her response brief is clearly different from the theory asserted in her complaint and, consequently, she has abandoned her interference claim. Plaintiff has never amended her complaint in this action, and as earlier noted, her original complaint reads as follows:

> 23. . . . Defendant attempted to interfere with Plaintiff's ability to use FMLA leave by "counseling" Plaintiff on her absences (despite knowing that the absences were protected by the FMLA) and then falsely claiming that Plaintiff's leave would not be protected unless she expressly mentioned the "FMLA."

Compl. ¶ 23. Evidencing defendant's reliance on this claim, its entire interference argument in its motion for summary judgment is devoted to rebutting the claim that it improperly counseled her or applied its call-in policy unlawfully. For example, defendant states, after citing the provision in the complaint noted above, that "[s]tated differently, she claims that her February 2015 final warning for unsatisfactory attendance constituted an unlawful application of Select Specialty's attendance policy and related call-in procedure." Def.'s Mot. 10-11. Defendant further correctly explains that Basham cannot allege any harm resulting from the counseling and call-in policy. Basham was not fired, or otherwise harmed, because of the counseling or the application of the call-in policy but rather because she allegedly failed to recertify her leave on time. Stephens Dep. 82 ("Q. So to simplify the issue, if Debbie turns in this, the paperwork on time, she's

not terminated?  A. Correct."); Resp. 10 ("Here, there is no

serious dispute that Debbie Basham was fired as a result of using

leave to care for her mother. . . .  [T]he company denied Ms.

Basham's FMLA request based entirely upon her purported failure to

timely <u>re-certify</u> . . . ." (emphasis original)).

Basham's response does not rebut these contentions.

Instead, she newly asserts that Select Specialty interfered with

her FMLA rights by terminating her employment.  She asserts that

there is "no serious dispute that [she] was fired as a result of

using leave to care for her mother.  Instead, the question is

simply one of entitlement."  Resp. 10.  Interference claims may

indeed sometimes be based on a failure to reinstate an employee.

<u>Ragsdale</u>, 535 U.S. at 86 ("Upon the employee's timely return, the

employer must reinstate the employee to his or her former position

or an equivalent.").  That, however, was not the interference

theory asserted in Basham's complaint.

Defendant's reply points out as much:

> The lone interference claim asserted in Basham's
> Complaint surrounds her allegation that her February
> 2015 final [counseling] for unsatisfactory attendance
> constituted an unlawful application of Select
> Specialty's attendance policy and related call-in
> procedure.  Basham now asserts, for the first time in
> her response . . . a new interference claim arising
> from her discharge.

Resp. 7-8.  Defendant is correct that Basham's response does not address the interference claim stated in her complaint, and consequently, she has abandoned it on summary judgment.  Because she cannot raise a new claim at this stage, however, no valid interference claim remains.  Accordingly, the court dismisses her interference claim for failure to raise a genuine issue of material fact.

### d.    The Retaliation Claim

Retaliation claims are distinct from interference claims to the extent that they require a plaintiff to prove a retaliatory intent.  See 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."); Stallings v. Hussmann Corp., 447 F.3d 1041, 1051 (8th Cir. 2006) (a "retaliation claim requires proof of retaliatory intent").  "Plaintiff must prove three elements to establish a prima facie case of retaliation: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events."  Adams, 789 F.3d at 429 (quotation marks omitted) (citing Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc)).

Retaliation claims follow Title VII's burden-shifting framework after a plaintiff makes out a prima facie case. Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (retaliation claims "are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)"). An employer must provide a nondiscriminatory reason for its adverse employment action, and

> once an employer has met its burden of producing a legitimate nondiscriminatory explanation for its decision, the plaintiff is afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). That is, [plaintiff] could attempt to establish that she was the victim of intentional discrimination by "showing that the employer's proffered explanation is unworthy of credence." Id. at 256, 101 S.Ct. 1089.

Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 646 (4th Cir. 2002); Adams, 789 F.3d at 429 (plaintiff must show that "taking the adverse employment action was pretextual"); Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1003 (8th Cir. 2012) ("To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules."). The Fourth Circuit has distinguished "pretext" and "retaliatory animus" as two

independent bases that justify a finding of retaliation.  See

Dotson v. Pfizer, Inc., 558 F.3d 284, 296 (4th Cir. 2009)

(declining to address respondent's argument regarding retaliatory

animus because plaintiff "put on sufficient evidence [at trial] .

. . show[ing] that a jury could rationally find" respondent's

stated reason for termination was pretextual).  Of course,

"[d]efendants of even minimal sophistication will neither admit

discriminatory animus nor leave a paper trail demonstrating it."

Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987).

Plaintiff here presents her claim as an argument that Select

Specialty's reasons were pretextual.  That is, Basham argues that

her alleged failure to recertify was pretext for a deeper subtext

of retaliation.

        The FMLA's regulations govern recertification.  "An

employer may require that a request for leave . . . be supported

by a certification issued by the health care provider of the

eligible employee."  29 U.S.C. § 2613(a).  Employers may likewise

require periodic recertifications of the initial certification for

leave.  See 29 C.F.R. 825.308(c).  FMLA's regulations provide

that, with respect to timing for providing a response to a

recertification request,

    [t]he employee must provide the requested
    recertification to the employer within the time frame
    requested by the employer (which must allow at least
    15 calendar days after the employer's request), unless

it is not practicable under the particular
circumstances to do so despite the employee's
diligent, good faith efforts.

29 C.F.R. § 825.308(d). In addition, consequences may be imposed

for failing to provide a recertification:

An employee must provide recertification within the
time requested by the employer (which must allow at
least 15 calendar days after the request) or as soon
as practicable under the particular facts and
circumstances. If an employee fails to provide a
recertification within a reasonable time under the
particular facts and circumstances, then the employer
may deny continuation of the FMLA leave protections
until the employee produces a sufficient
recertification. If the employee never produces the
recertification, the leave is not FMLA leave.

29 C.F.R. § 825.313(c). For an at-will employee, the consequence

of taking leave not deemed covered under the FMLA may sometimes be

termination. See, e.g., Yashenko, 446 F.3d at 551 (finding that

employee's termination was the result of legitimate reasons

unrelated to FMLA request rather than retaliation).

Select Specialty contends that Basham cannot make out a

prima facie showing of discrimination because she cannot show she

engaged in protected activity. Select Specialty, however,

terminated Basham immediately after she took what she believed to

be protected FMLA leave and attempted to recertify within the

deadlines provided to her. "While evidence as to the closeness in

time [between taking leave and termination] far from conclusively

establishes the requisite causal connection, it certainly

satisfies the less onerous burden of making a prima facie case of causality." Id. (quotation marks omitted). Furthermore, under the regulations quoted above, a company may deny FMLA leave only "[i]f an employee fails to provide a recertification within a reasonable time under the particular facts and circumstances." 29 C.F.R. § 825.313(c). The relevant inquiry is not whether the court thinks that Basham's actions were reasonable under the particular facts and circumstances. Rather, the question is whether the plaintiff has offered evidence sufficient to allow a reasonable jury to conclude that they were. See, e.g., Anderson, 477 U.S. at 248.

The question of whether her leave was protected under prong (1) of the Adams retaliation test (that is, whether she engaged in protected activity) does depend on whether she complied with the recertification requirements. Select Specialty apparently did not receive anything from Basham other than a four-page fax with a few grainy lines. Def.'s Mot. Ex. 17. There is evidence, however, to suggest that, under the particular facts and circumstances, Basham believed that she had diligently provided a recertification form to the hospital on May 16, 2015, using its fax machine, before the deadline of May 18th, Basham Dep. 110-113, and she subsequently asserted that fact at her discharge meeting a few days later on May 22nd, Stephens Discharge Mem. at 2. Basham might reasonably have believed that the fact that she received

only a mostly blank confirmation page nevertheless did not affect transmission of the recertification form to Select Specialty. Def.'s Mot. Ex. 17.  Furthermore, Basham did attempt to confirm transmission of the fax on May 21st, after not hearing from Select Specialty concerning her fax on May 16th.  Basham Dep. 125. Especially given that Basham had faxed the document at 8 p.m. on a Saturday night, a jury might believe it reasonable that she would not immediately follow up on the fax with Select Specialty. Def.'s Mot. Ex. 17.

Considering the problems that Basham apparently encountered with using the hospital's own fax machine and her attempt to follow up, a jury might reasonably conclude that in attempting to recertify and failing to do so because of an apparent technical error, Basham made diligent, good faith efforts to comply with Select Specialty's request.  See 29 C.F.R. § 825.313(c).  Select Specialty's Regional Human Resources Director, Barbara Foster, effectively admitted as much when she agreed that there was not much question that Basham "made a reasonable attempt" to recertify on time. See Foster Dep. at 68. Consequently, Basham has for summary judgment purposes made out a prima facie case that she engaged in protected FMLA leave and that her taking that leave was the "but-for" cause of her termination shortly thereafter.  See Adams, 789 F.3d at 429.

Once a plaintiff has made out a <u>prima facie</u> case of
retaliation, the analysis follows Title VII's burden-shifting
framework requiring a plaintiff to show pretext.  <u>Yashenko</u>, 446
F.3d at 551.  Of course, defendant contends that it fired Basham
for a nondiscriminatory reason: her failure timely to recertify.
Def.'s Mot. 17.  Basham notes that, for purposes of her summary
judgment response, she does not dispute that the hospital has
proffered a nondiscriminatory reason.  Resp. 17.  In order to
prevail on a retaliation claim, however, Basham must show that
this reason is pretext for a deeper subtext of retaliation.
<u>Adams</u>, 789 F.3d at 429.  Basham can do this by showing that the
reason given was "unworthy of credence."  <u>Dennis</u>, 290 F.3d at 646.
Skepticism of the reason given permits the trier of fact
ultimately to infer intentional discrimination.  <u>Reeves v.
Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 134 (2000).  "[A]n
employer's deviation from its own standard procedures may serve as
evidence of pretext."  <u>Hurlbert v. St. Mary's Health Care Sys.,
Inc.</u>, 439 F.3d 1286, 1299 (11th Cir. 2006); <u>Rudin v. Lincoln Land
Cmty. Coll.</u>, 420 F.3d 712, 727 (7th Cir. 2005) (same).  An
inference of pretext may also be permissible where an employee has
received good employment reviews.  <u>Morris v. City of Chillicothe</u>,
512 F.3d 1013, 1019 (8th Cir. 2008) ("Pretext may be shown with .
. . evidence that the plaintiffs recently received favorable
reviews . . . .").  Furthermore, "[i]n retaliation cases, the

whole is sometimes greater than the sum of the parts. . . .  [T]he
bits and pieces of evidence recounted [ ], taken collectively,
[may] have significant probative value."  <u>Harrington v. Aggregate
Indus. Ne. Region, Inc.</u>, 668 F.3d 25, 34 (1st Cir. 2012).

Basham makes three primary contentions in favor of
pretext.  First, she contends that the timing of the
recertification request departed from Select Specialty's normal
timing.  Def.'s Mot. 18.  Select Specialty did in fact certify and
recertify Basham's leave over the course of several years, and
their relationship appears to have been amicable until this latest
recertification request.  <u>See</u> Resp. Ex. 2.  Prior recertifications
were made at intervals of about seven to nine months or more,
Resp. Ex. 3, which was in line with Shakespeare's testimony about
the hospital's policy, <u>see</u> Shakespeare Dep. 54-55.  The hospital
issued this last request, however, so as to require
recertification less than six months after the previous one.

Defendant contends that its certification request was
earlier because Basham's absences began to spike in December 2014.
Under 29 C.F.R. 825.308(c), an employer may request
recertification more frequently if "[c]ircumstances described by
the previous certification have changed significantly (e.g., . . .
[the] frequency of the absence . . . )."  Here, a jury could find
that no significant change in circumstances had occurred.  In

particular, Basham's mother's physician had estimated on the previous recertification form that her mother would need care intermittently on approximately one day per week for two to four hours. Reply Ex. 27 at 3. The physician also estimated that the patient would have "flare-ups" and "related incapacity" approximately one to two times per month for eight hours. Id. at 4. Select Specialty appears to collapse these estimates by claiming that the doctor stated that Basham would only need to be absent once or twice per month. Reply 2. The doctor, however, did not provide a specific estimate of the number of days Basham would need to take leave each month. Reply Ex. 27 at 3-4. Although Basham's absences did increase somewhat from one day in December 2014 to four days in April 2015, at least the March and April absences took place after she had already received her February 24th disciplinary "Final Warning." Resp. Ex. 7. This might suggest that any "spike" in absences was not the cause of at least the final warning leading up to the recertification request. In sum, a jury could find that Basham's absences did not "spike" so dramatically as to justify an early recertification demand. Such a finding is probative of retaliation to the extent that "an employer's deviation from its own standard procedures may serve as evidence of pretext." Hurlbert, 439 F.3d at 1299.

Second, Basham contends that Select Specialty ignored other policies in order to justify her termination.  The company's attendance guidelines provide as follows:

> All counseling levels . . . should be given prior to termination with the exception of non-point based attendance infractions or those actions rising to the level of immediate termination. . . .
>
> . . . . Failure to improve and/or sustain improvement may result in the employee receiving additional disciplinary action up to and including termination.

Policy § 5.  Ordinarily, the company provided delinquent employees with three counseling opportunities prior to termination: (1) an "Attendance Policy Review" after six points, (2) a "Documented First Warning" after twelve points, and (3) a "Documented Written Warning" after sixteen points.  **Id.**  Basham aptly notes that Stephens, the hospital's HR Coordinator, emphasized his dedication to enforcing Select Specialty's employment policy.  **See, e.g.,** Stephens Dep. 144 ("Q: Why wouldn't you just do what the company had done before and reopen the Leave after talking to Debbie Basham?  A: I've already addressed his [sic] earlier, and that being, number one, policies and procedures; that's what I follow.").  Basham, however, testified that she had not received either of the counseling levels set forth in the disciplinary policy prior to receiving the "Final Warning" on February 24, 2015, <u>see</u> Basham Dep. at 86, and defendant's documents appear to

bear that out, Resp. Ex. 9.[1]  Select Specialty's policies, to be

frictionless justifications for adverse employment actions, must

be applied consistently.  See Harrington, 668 F.3d at 33

("[W]eaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffer[ ] can give rise to an

inference of pretext." (quotation marks omitted)).  The failure to

provide Basham with either an "Attendance Policy Review" or a

"Documented First Warning" would indicate a sharp deviation from

policy.

        Third, Basham argues that Select Specialty's explanation

for her termination is implausible as a whole.

    Finally, Select Specialty's explanation is, quite
    simply, unbelievable. Ms. Basham had worked for the
    company for almost fourteen years. She had utilized
    the FMLA on several occasions without any doubt of her
    need for leave, or the propriety of her usage of the
    leave. She had certified and re-certified the leave at
    least six times, Exhibit 3, and she returned — or at
    least attempted to return — the re-certification
    paperwork on time. The company then began the
    termination process before the deadline, (Shakespeare
    Dep. 95: 2-24; 96: 1-3), refused to contact Ms. Basham
    to inquire as to the paperwork (when doing so would
    have cured any deficiency prior to the deadline),
    (Shakespeare Dep. 98: 23-24) ("We do not contact the

_____

[1] Select Specialty claims that on January 16, 2015, it sent Basham
a letter reminding her of the importance of complying with the
call-in policy, but Basham disputes ever having received that
letter.  Basham Dep. 73-74.  Regardless, Select Specialty does not
assert that the reminder letter would have constituted either an
"Attendance Policy Review," the first level of counseling, or a
"Documented First Warning," the second level.  Policy § 5.

employees directly"), and ignored Ms. Basham's phone calls.

Resp. 19-20.  Basham's general contention is well struck.

Basham is correct that the company began the termination process before the deadline had yet expired and did not inquire as to the missing paperwork.  Shakespeare sent an email to Stephens at 11 a.m. on May 18th notifying him that Basham had not returned the paperwork, hours before the deadline actually expired, and she did not contact Basham regarding the paperwork.  Shakespeare Dep. 95, 98.  After attempting to contact Select Specialty on May 21st to confirm her fax, Basham explained to Stephens and Stump in her discharge meeting the following day that she had faxed the recertification paperwork.  Stephens Discharge Mem. at 2.  Nevertheless, Select Specialty made no attempt to revisit the termination decision despite the fact that Stephens later testified that he might have been able to "suggest we follow up and hold off [on the termination] at that point."  Stephens Dep. 145-46.  Basham also supplies at least one motivation to explain why Select Specialty would be looking for an excuse to terminate her: her absences required the hospital to hire a second respiratory therapist who cost it money.  Stephens Discharge Mem. at 2 ("Because of the irregularity of [Basham's] work attendance, we had to schedule another [respiratory therapist] to insure [sic]

consistent patient care.  This was an additional cost to the company.").

Furthermore, Select Specialty had not before notified Basham that she had incurred any attendance "points," but brought that to Basham's attention with its February 24th "Final Warning." Resp. Ex. 7.  Basham's strong prior employee reviews may also contribute to an inference of pretext.  Resp. Ex. 2; <u>Morris</u>, 512 F.3d at 1019 ("Pretext may be shown with . . . evidence that the plaintiffs recently received favorable reviews . . . .").  On the other hand, it is true that Select Specialty did grant Basham's request for an extension of the recertification deadline, perhaps mitigating against an inference of pretext.  Basham Dep. 108. However, "[t]he court's function at the summary judgment stage is not to weigh the evidence."  <u>Russell</u>, 65 F.3d at 1239.  The entire assemblage of facts and inferences, when drawn in the light most favorable to the non-movant, <u>Diebold</u>, 369 U.S. at 655, can certainly depict a story in which Basham's alleged failure to recertify provided a pretext for Select Specialty to terminate her.  Consequently, a reasonable jury may find that the subtext of Basham's termination was retaliation for her use of FMLA leave.

Defendant's reply to Basham's contentions is unpersuasive.  First, defendant argues that Basham's retaliation claim fails to attribute retaliatory animus to Weber, Select

Specialty's CEO, who ultimately made the hiring decision. Yet, this argument neglects evidence tending to show that Stephens, the HR Coordinator, also had significant influence on the termination decision. For example, Stephens testified that he could not "make the decisions, but [he] could have suggested [the hospital] follow up and hold off at that point." Stephens Dep. 145-46. Additionally, after receiving information regarding Basham's allegedly unprotected absences, Stephens emailed Shakespeare with some questions regarding Basham's recertification and stated that "[a]fter talking with Barb Foster, she had mentioned a couple of things to ask . . . since it looks like a termination for Ms. Basham." Resp. Ex. 17. These statements permit the inference that Weber was not the only person to have control over the decision to terminate. Furthermore, as noted above, an argument alleging pretext is distinct from one alleging "animus." See Dotson, 558 F.3d at 296.

Select Specialty also contends that pretext cannot be inferred from deviations from its progressive attendance policy because that policy "was neither mandatory nor rigorously followed." Reply 19. A failure to enforce a disciplinary policy may at times defeat an inference to pretext. See, e.g., Morris, 512 F.3d at 1020 (caveats regarding a number of disciplinary steps in a progressive discipline policy "negate its persuasiveness in showing pretext"); Emmett v. Kwik Lok Corp., 528 F. App'x 257, 262

(3d Cir. 2013) ("little" can be inferred where policy not "mandatory or rigorously followed").  Defendant is correct that its policy does contain a single, catchall disclaimer at its conclusion stating that "[Select Specialty] retains the authority to review infraction of the Attendance Policy on a case by case basis for possible exception upon the review and approval of the Executive Vice President of Human Resources."  Policy at 6.  <u>See also</u> Reply Ex. 31 (Stephens Aff.) ("Employees other than Debbie Basham have been discharged by Select Specialty without going through all steps of the progressive disciplinary policy process.").  On the other hand, Stephens testified, when asked why he did not revisit Basham's termination after hearing she had attempted to fax the forms in, that the policy was dispositive in her case: "number one, policies and procedures; that's what I follow."  Stephens Dep. 144.  Stephens likewise agreed that "in the ordinary course, [he] would expect an employee to roll through [the disciplinary] process."  <u>Id.</u> at 29.  These statements and others like them certainly provide some evidence that Select Specialty rigorously adhered to its attendance policy.  Again, the relevant inquiry is whether plaintiff has offered evidence from which a reasonable jury might infer pretext, without the court weighing such evidence.  <u>See, e.g.</u>, <u>Anderson</u>, 477 U.S. at 248.  As such, the failure to put Basham through the entire disciplinary

process provides some minimal inferential value when evaluating pretext.

Most important, as already discussed, the failure to adhere to the attendance policy is only one fact among others buttressing Basham's claim of pretext.  See Harrington, 668 F.3d at 34 (1st Cir. 2012) ("[In a retaliation claim,] the bits and pieces of evidence recounted [ ], taken collectively, [may] have significant probative value.").  At least five other facts can conjointly support an inference of pretext.  First, the costs that Basham's unpredictable and periodic absence imposed on Select Specialty suggest a motive.  Second, the shortened length of the interval predating the last recertification request may suggest an additional deviation from the hospital's normal policies.  Third, the company's unwillingness to revisit Basham's termination, even after she told Stephens that she had faxed in the recertification forms, could support an inference that it was looking for an excuse to fire her.  Fourth, by Barbara Foster's own admission, Basham made a "reasonable attempt" to recertify, calling in to question the decision to terminate her after she did so.  Fifth and finally, Basham's superior record as an employee may also support an inference of pretext.  This confluence of facts permits, but does not require, a reasonable jury to infer that Select Specialty retaliated against Basham.

Consequently, Basham's retaliation claim raises genuine issues of material fact sufficient to survive Select Specialty's motion for summary judgment.

### III.  Conclusion

For the foregoing reasons, it is ORDERED that defendant's Motion for Summary Judgment be, and it hereby is, granted with respect to Basham's interference claim and denied with respect to her retaliation claim.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED: June 1, 2017

John T. Copenhaver, Jr.
United States District Judge